❏ Original    ❏ Duplicate

**CLERK'S OFFICE**
**A TRUE COPY**
Feb 24, 2026
s/ MMK
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| Target Device, currently located at 3600 S. Lake Drive, | ) |
| St. Francis, Wisconsin 53235, more fully described in | ) |
| Attachment A | ) |

Case No.        26-MJ-51

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before    03/10/2026    *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Hon. William E. Duffin    .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____.

Date and time issued:    02/24/2026 at 3:40 p.m.    _William E. Duffin_
*Judge's signature*

City and state:    Milwaukee, Wisconsin    Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>**ATTACHMENT A**</u>

**Property to Be Searched**

The property to be searched is described as follows: an Apple iPhone 12 (International

Mobile Equipment ID: 351440822222827), currently listed under Milwaukee FBI Inventory No.

1B112, hereinafter referred to as the **TARGET DEVICE**. (<u>see</u> *Figures 1* and *2*).



*Figure 1*                              *Figure 2*

The **TARGET DEVICE** is currently located at the Federal Bureau of Investigation

Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in

the Eastern District of Wisconsin.     This warrant authorizes the forensic examination of the

**TARGET DEVICE** for the purpose of identifying the electronically stored information described

in Attachment B.

# ATTACHMENT B

1.     All records on the **TARGET DEVICE**, described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) (i.e., the Subject Offenses), and involve George BROOKS, including, but not limited to:

        a.  any documents and communications related to the Subject Offenses;

        b.  lists of contacts and related identifying information;

        c.  any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

        d.  any information recording schedule or travel;

        e.  all bank records, checks, credit card bills, account information, and other financial records;

        f.  photographs and/or videos depicting evidence of the Subject Offenses;

        g.  any evidence related to either the ownership, purchase, or possession of items used in the Subject Offenses;

        h.  records of internet activity, including browser history, search terms that the user entered into any internet search engine, and records of user-typed web addresses

2.     Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.



CLERK'S OFFICE
A TRUE COPY
Feb 24, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br>Target Device, currently located at 3600 S. Lake Drive, )<br>St. Francis, Wisconsin 53235, more fully described in )<br>Attachment A )| Case No.　　26-MJ-51 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a controlled substance; use of a communications facility to facilitate |
| 21 U.S.C. § 843(b) | the distribution of a controlled substance; and conspiracy to distribute a controlled |
| 21 U.S.C. § 846 | substance. |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JAMES BUCK　　Digitally signed by JAMES BUCK
Date: 2026.02.24 10:18:37 -06'00'

*Applicant's signature*

James Buck, FBI Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:　02/24/2026

*Judge's signature*

City and state:　Milwaukee, Wisconsin　　　　Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANT

I, James Buck, being first duly sworn on oath, on information and belief state:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a special agent with the Federal Bureau of Investigation (FBI) and currently assigned to the FBI's Milwaukee Area Safe Streets Task Force (MASSTF), a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including narcotics trafficking and conspiracy to possess narcotics with intent to distribute, as defined under Title 21 of the United States Code. I have been an FBI special agent since June 2023.

3. As a federal law enforcement officer, I have participated in numerous narcotics investigations which involved violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (possession with intent to distribute a controlled substance, unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance, and conspiracy to possess with intent to distribute a controlled substance), and other related offenses. I have had both formal training and have participated in numerous drug-trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

   a. I have used informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c. I have participated in several search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g. I know that drug traffickers commonly have in their possession, and at their residences and other storage locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials;

i. I know drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

j. I know drug traffickers maintain on-hand large amounts of U.S. currency to maintain and finance their ongoing drug business;

k. I know drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

2

l.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

m.   I know it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses, or other locations over which they maintain dominion and control;

n.   I know drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

o.   I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

p.   I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization; and

q.   I know drug traffickers take (or cause to be taken) and maintain photographs of themselves, their associates, their property, and their drugs.

4.      This affidavit is based upon my personal knowledge, training, and experience, and on information reported to me by other federal, state, and local law enforcement officers in the course of their official duties, all of whom I believe to be truthful and reliable.  This affidavit is

3

also based upon official records, witness statements, recorded statements, surveillance, and public records, which I consider to be reliable as set forth herein. Throughout this affidavit, reference will be made to case agents and/or investigators. Case agents and/or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      I have participated in several narcotics and firearms trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

6.      Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute a Controlled Substance), 843(b) (Unlawful Use of a Communication Facility

4

[including the mails] to Facilitate the Distribution of a Controlled Substance), and 846 (Conspiracy to Distribute and Possession with the Intent to Distribute Controlled Substances) have been committed by George BROOKS ("BROOKS") (DOB: XX/XX/1994).

8.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated. See 18 U.S.C. § 2711(3)(A)(i).

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9.    The property to be searched is described as follows: an Apple iPhone 12 (International Mobile Equipment ID: 351440822222827), currently listed under Milwaukee FBI Inventory No. 1B112, hereinafter referred to as the **TARGET DEVICE**.

10.    The **TARGET DEVICE** is currently located at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin.

11.    The applied-for warrant would authorize the forensic examination of the **TARGET DEVICE** for the purpose of identifying electronically stored data more particularly described in Attachment B.

## PROBABLE CAUSE

### *Background*

12.    In September 2023, case agents interviewed a Source of Information (SOI1) regarding George BROOKS.  The SOI stated that he/she knew an individual named "George Brooks," using the alias "Greedy," who would purchase and sell powder cocaine, "crack" cocaine, and marijuana.  The SOI also indicated that BROOKS would trade in firearms.

5

13.     The FBI's Milwaukee Area Safe Streets Task Force (MASSTF) subsequently opened an investigation into George BROOKS, who case agents learned was a suspected member of the Gangster Disciples street gang.  During the investigation, case agents gained information and evidence through oral and written reports, court-ordered documents, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, and consensually-recorded meetings and calls.  Through these investigative techniques, case agents determined that BROOKS was engaged in narcotics trafficking and that he unlawfully possessed firearms.  Using a confidential human source (CHS),[1] MASSTF conducted several controlled narcotics purchases and a controlled firearms purchase from BROOKS.

*Controlled Purchase of Cocaine and Marijuana – November 1, 2023*

14.     On November 1, 2023, the CHS, under the direction of MASSTF, conducted a controlled purchase of approximately 27.2 grams of suspected powder cocaine and approximately a half pound of suspected marijuana from BROOKS in exchange for $2,000.00 in pre-recorded cash.  Prior to the controlled purchase, case agents searched the CHS for contraband, with negative results, and activated recording equipment provided to the CHS.  During a recorded call, BROOKS informed the CHS that they would meet at "65th and Hampton."  At approximately 3:50 p.m., the CHS arrived in the vicinity of 4800 N 65th Street, Milwaukee, Wisconsin.  At approximately 3:50

---

[1] Your Affiant believes that the CHS is credible.  Your Affiant and other law enforcement officers have extensively questioned the CHS about various individuals whom your Affiant is currently investigating concerning drug trafficking and the unlawful possession of firearms.  Substantial portions of the CHS's information have been corroborated by independent investigation, information contained in oral and written reports, physical and electronic surveillance, public records, telephone toll records, pen registers and trap and trace information, and consensually-recorded meetings and calls.  The CHS has multiple felony convictions.  The CHS is cooperating with law enforcement for favorable consideration in a pending federal case.  For these reasons, your Affiant believes the CHS is reliable.

6

p.m., the CHS received a call from BROOKS, who directed the CHS to turn onto N. 65th Street immediately north of W Hampton Avenue. The CHS parked halfway up the block on N 65th Street. Shortly thereafter, a white Mercedes sedan, bearing Wisconsin plates numbered AMX4745, arrived, followed by a white Jeep, bearing Wisconsin plates numbered MV4713C. At approximately 3:52 p.m., BROOKS exited the Mercedes and entered the back seat of the white Jeep.

15. A Honda Odyssey, bearing Wisconsin plates numbered AST5463, arrived, and case agents observed the Odyssey's driver conduct a hand-to-hand exchange, with cash visible, through the windows of the Odyssey and the white Jeep. At approximately 3:56 p.m., case agents observed BROOKS exit the white Jeep and walk out of view of physical surveillance. According to the CHS, BROOKS approached the CHS's vehicle where the CHS gave BROOKS $2,000.00 in cash through the vehicle's open driver-side door. The CHS said BROOKS then entered the backseat of the white Jeep, and thereafter conducted a hand-to-hand transaction with the Odyssey's driver before returning to and entering the CHS's vehicle. According to the CHS, BROOKS then gave the CHS the suspected powder cocaine and marijuana. After this controlled transaction, case agents retrieved the suspected contraband from the CHS. Consistent with typical packaging for street-level narcotics distribution, the suspected marijuana was contained in two clear vacuum-sealed bags, and the suspected powder cocaine was contained in a knotted clear baggie. The suspected powder cocaine was submitted to the North Central DEA Laboratory, which subsequently confirmed, within an estimated 95% level of confidence, that the substance was powder cocaine.

7

*Controlled Purchase of Methamphetamine – December 23, 2025*

16.     On December 23, 2025, the CHS, under the direction of MASSTF, conducted a controlled purchase of methamphetamine from BROOKS.  Prior to the controlled purchase, case agents searched the CHS and his/her vehicle for contraband with negative results.  At approximately 11:28 a.m., the CHS called BROOKS, who was using the cell phone assigned number (414) 408-5100.  Your Affiant knows that the number (414) 408-5100 is associated with a CashApp account having CashTag "George Brooks" and "$ImUpNowG."  During the call, BROOKS directed the CHS to meet at N. 65th Street and W Hampton Avenue to conduct the methamphetamine transaction.  The CHS indicated that BROOKS would charge $3000.00 for a pound of methamphetamine.  The case agents provided CHS1 with a recording device to capture his/her meeting with BROOKS.

17.     At approximately 12:03 p.m., case agents observed BROOKS park a white Cadillac Escalade pickup truck, bearing Wisconsin plates numbered BCJ3455, in the 4800 block of N 65th Street, Milwaukee, Wisconsin.  Before the methamphetamine transaction, case agents observed a Buick Encore, bearing South Carolina plates numbered 217APP, parked at the same location.  At approximately 12:06 p.m., BROOKS entered the Buick Encore.  At approximately 12:10 p.m., BROOKS exited the Buick Encore while holding a food container.  BROOKS then entered the CHS's vehicle with the food container.  At this time, the CHS gave BROOKS $3,000.00 in pre-recorded cash.  At approximately 12:11 p.m., the case agents observed BROOKS exit CHS's vehicle without the food container and re-enter the Buick Encore.  At approximately 12:13 p.m., the case agents observed BROOKS exit the Buick Encore and approach the driver-side door of CHS's vehicle.  The CHS said that BROOKS had carried a box containing the suspected methamphetamine to the CHS's vehicle and passed it to the CHS through the vehicle's open

8

window. The case agents then observed the Buick Encore depart the location. After this controlled transaction, MASSTF took custody of the suspected pound of methamphetamine, which was contained in a clear Ziploc bag, as is consistent with street-level narcotics trafficking. The case agents also searched the CHS1 and his/her vehicle, which otherwise yielded negative results. The suspected methamphetamine, which appeared to be an off-white crystal-like substance, was tested with a TruNarc Analyzer, indicated the substance was positive for methamphetamine.

18. Prior to the controlled methamphetamine purchase, the CHS informed case agents that BROOKS's cell phone number was (414) 408-5100. A query through law-enforcement records revealed that "George None Brooks" was the listed subscriber for (414) 408-5100. Under the direction of law enforcement, the CHS called BROOKS at this cell phone number to arrange the controlled methamphetamine purchase. During these communications, BROOKS discussed matters related to his drug-trafficking activity, including the prospect of future narcotics transactions, the available quantities of certain narcotics, and the prices of certain narcotics, specifically cocaine and methamphetamine.

*Identification of BROOKS's residence and a suspected drug transaction*

19. The case agents have observed BROOKS routinely use the white Cadillac Escalade pickup, bearing Wisconsin plates numbered BCJ3455, and park it on the rear slab next to the unattached garage associated with the residence at 3705 N 36th Street, Milwaukee, Wisconsin 53216 (the Residence). On February 7, 2026, at approximately 9:54 a.m., the case agents observed a white 2023 Tesla sedan, bearing Wisconsin plates numbered BCF9465 park on the rear parking slab of the Residence, followed by the Cadillac Escalade pickup truck. BROOKS exited the Escalade and a female, believed to be Sharita MOSES (DOB: XX/XX/1982), exited the Tesla's driver's compartment. BROOKS and MOSES retrieved what appeared to be groceries and brought

9

them inside the rear of the Residence. Since February 7, 2026, the case agents have observed BROOKS primarily using the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and parking it on the same rear parking slab associated with the Residence.

20. On February 10, 2026, at approximately 5:34 a.m., case agents observed a subject matching BROOKS's description exit the Residence, enter the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and depart the location at approximately 5:40 a.m. At approximately 6:48 a.m., the case agents observed the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, park on the parking slab for the Residence and BROOKS exit the vehicle. The case agents then observed BROOKS enter the rear entrance of the Residence using keys to access the residence.

21. On February 10, 2026, at approximately 12:37 p.m., the case agents observed BROOKS exit the Residence and enter the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, that was parked on the parking slab for the Residence. At approximately 12:39 p.m., the case agents observed an unknown black male (UM), who was wearing a puffer jacket and dark winter beanie, approach the front driver-side window of the white Tesla sedan occupied by BROOKS. The case agents observed the UM extend his empty left hand into the Tesla's half-opened driver-side front window and receive a small baggie containing a green substance, which case agents believed to be marijuana. The case agents observed that the UM held the baggie to his nose and sniffed its contents while communicating with BROOKS. At approximately 12:41 p.m., the case agents observed that the UM had concluded his interaction with BROOKS and departed the location. The case agents then observed BROOKS exit the white Tesla sedan, bearing Wisconsin plates numbered BCF9465, and enter the Residence's unattached garage, using keys to access the garage door. Based on training and experience, your Affiant believes BROOKS had

10

conducted a hand-to-hand marijuana transaction with the UM, particularly given the short duration of their interaction, the transfer of what appeared to be a controlled substance, and BROOKS's history of possessing and trafficking controlled substances, including marijuana.

*Search of BROOKS's residence and seizure of the TARGET DEVICE*

22.     On February 18, 2026, the case agents executed a warrant to search the Residence (i.e., 3705 N 36th Street, Milwaukee, Wisconsin 53216).   Immediately before entering the Residence, the case agents arrested BROOKS based on a warrant issued for his arrest in relation to the above-referenced controlled purchases of narcotics.   As the case agents searched the Residence, they found a black Apple iPhone (the **TARGET DEVICE**) in the living room on the first floor of the Residence.   The **TARGET DEVICE** appeared worn, as though it had extended use, and on its lock screen was an image of BROOKS and a female. (See *Figures 1* and *2*). Furthermore, your Affiant knows that Tesla vehicles, like the one used by BROOKS and parked at the Residence, allow for three means of access: key cards, key fobs, and cell phones, with the vehicle owner's cell phone serving as the primary access device, through Bluetooth connection, with the owned vehicle.   To gain entry to the Tesla sedan, bearing Wisconsin plates numbered BCF9465, which was authorized under the search warrant for the Residence, the case agents were able to access the vehicle by holding the **TARGET DEVICE** in proximity to the vehicle's door. Upon doing so, the Tesla activated and the name "George B" appeared on the media display at the center of the vehicle's dashboard.   Based on the foregoing, your Affiant believes BROOKS is the user of the **TARGET DEVICE**.

11



*Figure 1*                    *Figure 2*

**CONCLUSION**

23.     Given the facts detailed above, BROOKS is known to use a cellular phone to discuss and arrange illicit narcotics transactions.  Upon executing a search of the Residence, where BROOKS resided, the case agents found the **TARGET DEVICE** in the living room.  Based on the facts detailed above, the **TARGET DEVICE** not only appeared to belong to BROOKS, but it also appeared to have been in use for an extended period of time.  Accordingly, based on training, experience, and the above information derived from this investigation, your Affiant believes BROOKS used the **TARGET DEVICE** to facilitate drug trafficking, and thus evidence of drug trafficking may be stored and recorded on the **TARGET DEVICE**.

24.     Through my training, experience, and discussions with other experienced law enforcement officers, your Affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their

12

use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

25.     Based upon my training and experience, your Affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers and co-conspirators in the distribution of controlled substances.  Your Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

26.     Based on my training and experience, your Affiant is aware that individuals involved in trafficking controlled substances often possess a cellular device to compartmentalize their illegal activity and to avoid law enforcement detection.

27.     Based upon my training and experience, your Affiant believes it is common for crime suspects who possess illegal controlled substances to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances involved in drug trafficking.  Furthermore, your Affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

28.     Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and trafficking of controlled substances; (2) BROOKS's arrest in connection with the recent distribution of illicit controlled substances; and (3) an Apple iPhone (i.e., the **TARGET DEVICE**) having been recovered from BROOKS's residence, there is probable cause to believe that a search of the information contained within the above described **TARGET DEVICE** will produce

13

evidence of a crime, namely evidence related to conspiracy to possess with intent to distribute and to distribute controlled substances, possession with intent to distribute and distribution of controlled substances, and the unlawful use of a communication facility to facilitate the distribution of controlled substances.

29.　　The **TARGET DEVICE** was seized by the FBI during the search of BROOKS's residence (i.e., 3705 N 36th Street, Milwaukee, Wisconsin 53216) on February 18, 2026.

30.　　The **TARGET DEVICE**, currently listed under Milwaukee FBI Inventory No. 1B112, is in storage at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin. In my training and experience, your Affiant knows that **TARGET DEVICE** has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of the FBI.

31.　　Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICE** described in Attachment A to seek the items described in Attachment B.

## TECHNICAL TERMS

32.　　Based on my training and experience, your Affiant uses the following technical terms to convey the following meanings:

> a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include:

14

storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four

15

satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

16

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33.     Based on my training, experience, and research, your Affiant knows that the **TARGET DEVICE** has the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all have the ability to access the internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.     Based on my knowledge, training, and experience, your Affiant knows that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

35.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE** was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

17

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the **TARGET DEVICE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **TARGET DEVICE** to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.* Because this warrant seeks only permission to examine the device once in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

18

## ATTACHMENT A

### Property to Be Searched

The property to be searched is described as follows: an Apple iPhone 12 (International Mobile Equipment ID: 351440822222827), currently listed under Milwaukee FBI Inventory No. 1B112, hereinafter referred to as the **TARGET DEVICE**. (underline see *Figures 1* and *2*).



*Figure 1*                                   *Figure 2*

The **TARGET DEVICE** is currently located at the Federal Bureau of Investigation Milwaukee Field Office located at 3600 S. Lake Drive, St. Francis, Wisconsin 53235, which is in the Eastern District of Wisconsin. This warrant authorizes the forensic examination of the **TARGET DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the **TARGET DEVICE**, described in Attachment A, that relate to violations of 21 U.S.C. §§ 846, 843(b), and 841(a)(1) (i.e., the Subject Offenses), and involve George BROOKS, including, but not limited to:

      a.  any documents and communications related to the Subject Offenses;

      b.  lists of contacts and related identifying information;

      c.  any information related to criminal activity and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

      d.  any information recording schedule or travel;

      e.  all bank records, checks, credit card bills, account information, and other financial records;

      f.  photographs and/or videos depicting evidence of the Subject Offenses;

      g.  any evidence related to either the ownership, purchase, or possession of items used in the Subject Offenses;

      h.  records of internet activity, including browser history, search terms that the user entered into any internet search engine, and records of user-typed web addresses

2.      Evidence of user attribution showing who used or owned the **TARGET DEVICE** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.